IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TYRONE SMITH,

        Petitioner,

vs.                                  No. CIV 04-261 MCA/LFG

DONALD DORSEY, Warden,
Western New Mexico Correctional
Facility,

        Respondent.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

    1.  This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed March 9, 2004.  Petitioner Tyrone Smith ("Smith") challenges the judgment and sentence entered by the Second Judicial District Court in <u>State v. Tyrone Smith</u>, No. CR 94-1321 (County of Bernalillo, New Mexico). Respondent filed his Answer on May 10, 2004.  On May 12, 2004, Respondent filed a Motion to Dismiss the Petition [Doc. 10], along with a supporting memorandum. Smith filed a response to the motion on June 9, 2004.  Respondent's Motion to Dismiss is now ready for ruling.

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommenda-tions.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

**Factual and Procedural History**

2.  Jerol Younger's ("Younger's") body was found in a ditch in Albuquerque in September 1992, covered with plastic garbage bags and sheets and wrapped in cords and duct tape. Younger received several hammer blows to the head and his body also showed signs of asphyxia, possibly strangulation. It was unclear whether Younger was still alive at the time his body was put into the ditch.

3.  On June 10, 1994, Smith was indicted, along with Denise Spikes ("Spikes") and Matt Brown ("Brown") on charges of murder, conspiracy, tampering with evidence, and bribery of a witness. Smith pled not guilty. Smith and Brown were tried together, Spikes' case having been severed prior to trial. The jury found Smith guilty of first degree murder, conspiracy to commit murder, and tampering with evidence. He received a sentence of life plus twelve years.

4.  At trial, the primary evidence against Smith was Spikes' testimony and that of Frank Lucero ("Lucero"). Spikes is the ex-wife of the victim, Younger, and is the mother of his child. She was Smith's girlfriend at the time of the murder. She testified at trial under a grant of use immunity. Spikes said that Smith was jealous of Younger's continued attentions to her and that in September 1992, Smith forced her to drive to Albuquerque with him from her home in California in order to confront Younger about the situation. Spikes said that after they arrived in Albuquerque they joined up with Brown, who was Smith's friend, and then drove over to a house in Albuquerque to collect Smith's cousin, Lucero.

5.  Spikes further testified that the four of them got into Smith's vehicle and drove to Lucero's apartment in Albuquerque's South Valley. She said that she and Smith let the others off there and the two of them then drove to downtown Albuquerque, where Smith told Spikes to call Younger and

2

have him drive her back to Lucero's place. She called Younger, and he picked her up in his white BMW. When she and Younger arrived at Lucero's, Spikes said, they got out of his car and walked up to the apartment. As they approached the front door, she saw some hands grab Younger and pull him inside, and the door slammed in her face.

6. Spikes said that she then heard Younger scream and she ran away on foot, looking for a telephone. By the time she reached a pay phone, however, Smith drove up, prevented her from making a phone call, and made her get into his car. They then drove back to Lucero's apartment, where Smith went back inside for a moment while she waited in the car. She noticed that Younger's car was no longer there. Later that day, she drove back to California alone. She said she learned later that Younger was dead.

7. Lucero also testified for the State, under a grant of transactional immunity. For the most part, his testimony coincided with Spikes' version of events. Lucero stated that Smith and Brown picked him up at his girlfriend's house and took him to his own apartment in the South Valley, where they said someone was coming by to pick up a television set. Lucero said that Smith and Spikes then left the apartment, and Smith later returned alone with a television set, which he placed in Lucero's closet. Awhile later, he said, he heard a car drive up outside. He heard two voices, one of them Spikes'. Only one person entered the apartment, however, a man whom Lucero said he didn't know.

8. Lucero testified that when the man, later identified as Younger, approached the closet to look at the TV, Smith and Brown attacked him with a hammer. Lucero said further that Brown held a gun on Younger while Smith tied him up. Smith told him to take Younger's car away from the apartment and leave it somewhere, and he did so. As he was walking back from dropping off the car, he said, Smith picked him up and drove him back to the apartment. Lucero said he helped Smith and

Brown load the body into a vehicle and put it in the ditch.

9.   Other evidence at trial revealed that Lucero's apartment was destroyed in a fire shortly after the murder.  Fire investigators identified the cause as arson.  In the building's remains, police found a broken hammer, plastic bags, duct tape and cords.  No fingerprint evidence was found on Younger's body after it was pulled from the ditch, nor in the apartment after the fire.  No blood or other physical evidence was found linking Smith and Brown to the murder.

10.   Other trial testimony relevant to the issues raised by Smith includes the following.  Lucero's cousin Denise Purcell and another woman testified that shortly after Younger's body was found, Lucero told them he murdered Younger because he owed him money for drugs.  There was also evidence that Lucero was drinking heavily after the murder and that he had used crack cocaine on two occasions, a few weeks before and a few weeks after the day of the murder.  There was also testimony that prior to the murder, Lucero had been seen with a man in a white BMW whose description might have matched Younger's.  This was the only evidence of a link between Lucero and Younger prior to the killing.

11.   A witness testified that Younger had been seen in his own apartment handing a package to another man, in what might have been a drug deal.  The stipulated testimony of Officer Karen Thomas was admitted into evidence; she stated that she had been investigating Younger for possible drug activity in the months prior to his death, although charges were never brought.  She also stated that she knew of no link between Younger and Lucero.

12.   Lucero's aunt, Linda Satomba, testified that sometime after the murder in 1992, Lucero came to live with her in San Jose, California.  He was in an agitated state and appeared nervous and afraid.  She questioned him about his changed appearance and behavior, and he eventually told her,

in bits and pieces, about the events of September 1992. Her testimony as to what he said was consistent with Lucero's testimony which implicated Smith and Brown in the murder.

13.   Theresa Jimenes, a friend of Spikes' with whom she lived in California, testified that Spikes told her, about a month before the murder, that Smith asked her to help him kill Younger so they could collect insurance money. Another friend, Constance O'Grady, testified that in June 1994, Spikes told her that she and Smith, along with Lucero and Brown, had planned in advance to kill Younger, and that Spikes' role was to lure Younger to the place where he was to be murdered. O'Grady said further that Spikes told her that she didn't want to do it, but Smith threatened to kill her and harm her son if she didn't go along. On the stand, Spikes specifically denied that she made either of these statements to Jimenes or O'Grady.

14.   Following his conviction and sentence, Smith appealed to the New Mexico Supreme Court. His appeal was consolidated with that of Matt Brown. The state supreme court affirmed the convictions in an opinion filed September 16, 1998,[2]   and denied Smith's motion for rehearing on November 5, 1998.

15.   On July 19, 1999, Smith filed a petition for habeas corpus in state district court. The district judge held an evidentiary hearing and issued an order on June 19, 2003 denying Smith's habeas corpus petition. Certiorari was denied by the state supreme court on August 25, 2003, and by the United States Supreme Court on January 26, 2004.

16.   Smith filed his petition for federal habeas relief in the Court on March 9, 2004. The Court finds that Smith's petition for habeas corpus is timely.

---

[2]The New Mexico Supreme Court's opinion is titled State v. Brown, 126 N.M. 338, 969 P.2d 313 (1998); however, in these Findings and Recommended Disposition, that opinion will be referred to as State v. Smith.

## Grounds Asserted for Habeas Relief

17.  Smith presents four claims of ineffective assistance of counsel (Claims I A - I D), and seven other claims for relief (Claims II A - II G), as grounds for federal habeas review, as follows:

### *Claims of Ineffective Assistance of Trial Counsel*

Claim I A.  Counsel failed to request a limiting instruction that Lucero's prior consistent statements, presented during the testimony of Linda Satomba, were admissible for the purpose of rehabilitation only, and not for the truth of the matter asserted.

Claim I B.  Counsel failed to move, prior to trial, to exclude Lucero's testimony on grounds his transactional immunity agreement with the State was impermissibly coercive.

Claim I C.  Counsel failed to present evidence that Spikes' motive to lie arose at the time of the murder in September 1992, rather than later, when police questioned her in January 1993, thus rendering inadmissible Theresa Jimenes' testimony about prior consistent statements made by Spikes shortly after the murder in September 1992.

Claim I D.  Counsel failed to object under NMRA 11-403 to testimony of Constance O'Grady and Theresa Jimenes, former friends of Spikes, who testified that Spikes made prior statements, inconsistent with her trial testimony, to the effect that she and Smith had formed plans to kill Younger.

### *Other Constitutional Claims*

Claim II A.  The prosecution violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), by failing to disclose police investigation records showing that other victims were murdered using the same modus operandi that Younger's killer used; and the trial court violated Smith's due process rights by refusing to conduct an evidentiary hearing on this issue or to require production of the information.

Claim II B.  The trial court violated Smith's right of confrontation by imposing a stipulation regarding the testimony of Officer Karen Thomas, which included her statement that she could not connect Lucero with Younger's drug operation.

Claim II C.  The Lucero immunity agreement violated Smith's right to due process because it was impermissibly coercive.

Claim II D.  The trial court violated Smith's right to confrontation by barring cross-examination of Lucero about his prior efforts to exculpate himself.  In addition, the trial court violated Smith's rights to due process, to compulsory process, and to trial by jury in that the court: (1) refused to permit Smith to present evidence through cross-examination of Lucero

6

regarding his prior drug-related activities to show Lucero's connection with Younger and his motive to commit the murder; (2) refused to permit Smith to present evidence of Lucero's use of intoxicants during the time of certain events about which he testified; and (3) refused to give a cautionary instruction about the testimony of an addict.

Claim II E.  The New Mexico Supreme Court violated Smith's right to due process by upholding the trial court's admission of Lucero's prior consistent statements on grounds not cited by the trial court.

Claim II F.  The trial court violated Smith's right to due process by failing to give an instruction on the lesser included offense of voluntary manslaughter.

Claim II G.  Smith's due process rights were violated by the cumulative effect of all of the above errors.

## Discussion

18.  All of the above claims were presented to the state courts, either on direct appeal or in state habeas proceedings or both.  A federal court is precluded from granting habeas relief on any claim adjudicated on the merits by the state courts, unless the state proceeding resulted in a decision that was contrary to or involved unreasonable application of clearly established federal law -- that is, if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; or unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented – that is, if the state court confronted a set of facts materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a different result. 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 406, 413, 120 S.Ct. 1495 (2000); Smallwood v. Gibson, 191 F.3d 1257, 1264-65 (10th Cir. 1999).

19.  A federal court may not issue a habeas writ "simply because we conclude in our independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Gipson v. Jordan,

376 F.3d 1193,1196 (10th Cir. 2004).  "Federal habeas courts do not sit to correct errors of fact or to relitigate state court trials.  Our jurisdiction is limited to ensuring that individuals are not imprisoned in violation of the Constitution."  Thompson v. Oklahoma, 202 F.3d 283 (Table, text in Westlaw), No. 98-7158, 2000 WL 14404, at *6 (10th Cir. Jan. 10, 2000); Scrivner v. Tansy, 68 F.3d 1234, 1238 (10th Cir. 1995).

20.  With these standards in mind, the Court turns to Smith's eleven claims of constitutional violation.

### Claim I A
#### Ineffective Assistance of Counsel in Failing to Request a Limiting Instruction on Satomba's Testimony

21.  Smith argues that his trial attorney was constitutionally ineffective in four specific ways. To establish ineffective assistance of counsel, Smith must make a two-pronged showing:  (1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

22.  To prove deficient performance, Smith must overcome the presumption that counsel's conduct was constitutionally effective.  Duvall v. Reynolds, 139 F.3d 768, 776 (10th Cir. 1998). Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight.  Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995).  In order to be found constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.  Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997).

23.   Each of the four alleged failings by trial counsel was raised in Smith's state habeas petition and was explored in an evidentiary hearing on the petition.  All claims of ineffectiveness were rejected by the state district court in a carefully crafted and detailed written opinion, and certiorari was denied by both the state supreme court and the United States Supreme Court.  The claims have been thoroughly exhausted, and this Court must apply the deferential standard of review as set out in 28 U.S.C. § 2254(d) and as explained in Williams v. Taylor, *supra*.

24.   Smith's first charge of ineffectiveness is that his attorney failed to request a limiting instruction advising the jury that Lucero's prior consistent statements, presented during the testimony of his aunt Linda Satomba, were admissible solely to rehabilitate Lucero's credibility and not for their substantive truth.  Smith claims that the result of the proceeding would have been different if Smith's trial counsel had requested this instruction.

25.   New Mexico Rule of Evidence 11-801(D)(1)(b) corresponds to Fed. R. Evid. 801(d)(1)(B).  Both exclude from the definition of hearsay a prior statement, consistent with the declarant's trial testimony, which is offered to rebut an express or implied charge of recent fabrication or improper influence or motive.  At the time of Smith's trial, the Supreme Court had recently decided Tome v. United States, 513 U.S. 150, 115 S. Ct. 696 (1995), a case arising in the District of New Mexico.  In Tome, the Court held that prior consistent statements, in order to be considered non-hearsay and therefore admissible as substantive evidence, must have been made prior to the time the motive to fabricate, or the alleged improper influence or motive, arose.  Otherwise, such statements would be admissible only to rehabilitate a declarant whose credibility was attacked on cross examination.

26.  Lucero was an important witness for the prosecution.  He testified that in 1993, he was

9

living with his aunt Linda Satomba and shared with her his account of Younger's murder, an account which was highly incriminating to Smith. [TR 3, at 145-46]. He was cross-examined about this statement, and about the immunity deal he made with the State, by attorneys for both defendants. The questioning on cross-examination was designed to raise the implication that Lucero lied in order to obtain the immunity deal and that his testimony falsely portrayed him as an innocent bystander. [TR 4, at 19-20; 99-106].

27. Linda Satomba also testified at trial and described for the jury what Lucero told her about the murder. The trial court overruled Smith's hearsay objections to this testimony. Smith's counsel argued that Lucero's motive to fabricate arose at the time of the murder, and his statements to Satomba were therefore not admissible as substantive evidence under Rule 801(D)(1)(b). Counsel also repeatedly objected during Satomba's testimony, arguing the testimony was straying beyond the confines of the Rule. The court rejected these arguments and allowed the testimony to come in on grounds Lucero's motive arose "at the time the deal was struck," that is, at the time he entered into the immunity agreement with the State. [TR 4, at 178-198, 221].

28. The New Mexico Supreme Court agreed with defendants that Lucero's motive to fabricate arose at the time of the murder and not, as the trial court found, at the time of his arrest two years later, and held that the ruling by the trial judge was therefore erroneous. State v. Smith, *supra* 126 N.M. at 348-49. However, the court upheld admission of Satomba's testimony on the ground that the statements were admissible to rehabilitate Lucero, whose credibility had been attacked earlier in cross examination.

> There is language in Tome that suggests that . . . Rule 801 of the Federal Rules of Evidence [i]s the sole means of admitting prior consistent statements and that even rehabilitative uses must comply

10

> with Rule 801 and the premotive requirement.  However, we do not
> believe that <u>Tome</u> should be interpreted so broadly or that our Rules
> of Evidence should be interpreted so narrowly . . . .  [W]e conclude
> that Rule 11-801 does not prohibit certain limited rehabilitative uses
> of prior consistent statements.

<u>State v. Smith</u>, *supra*, 126 N.M. at 350-51.

29.  Smith filed a motion for rehearing on this ruling, which was denied by the Supreme

Court.  [Answer, Exs. G-K].  He next filed a habeas petition in state court, raising *inter alia* the

argument that his attorneys were ineffective for failing to request a limiting instruction which would

have directed the jury to consider Satomba's testimony as rehabilitation, rather than as substantive

evidence of Smith's involvement in Younger's murder.

30.  At the evidentiary hearing on the habeas petition, Smith's trial counsel was asked why

he did not request a limiting instruction.  He  responded that the prosecutor offered the testimony

under Rule 801 and not as rehabilitation, and that it was clear "to everyone in the courtroom" that

the out-of-court statement was being admitted by the trial judge as substantive evidence.  [Transcript

of hearing on petition for habeas corpus in <u>State v. Smith</u>, CR 94-1321, Second Judicial District

Court for the State of New Mexico, Day I, October 12, 2001, at 5; hereinafter referred to in the

format, "HC I, at 5"].  Trial counsel stated further that he might have asked for a limiting instruction,

"for what little value it has," if he had thought the statements were being admitted for rehabilitative

purposes; however, he also said he did not think the result would have been different if he had asked

for the instruction.  [HC I, at 6, 32].

31.  In the order denying habeas relief, the state court held, "It is clear that any limiting

instruction regarding this testimony would have had little value and would not have changed the

outcome of the case."  [Answer, Ex. R, at 2].  The habeas judge noted further that trial counsel

argued against admission of Satomba's testimony on the basis of <u>Tome</u>, *supra*, "which was then the controlling precedent in this area of the law," but that the trial court improperly rejected this argument. [<u>Id.</u>, at 3]. He concluded that "Defense counsel was not obligated to predict that Lucero's prior consistent statements would be admissible on another basis and request a limiting instruction . . . . It was not deficient for Petitioners' counsel to not anticipate rehabilitative use of Lucero's prior consistent statements, nor to ask for a limiting instruction." [<u>Id.</u>, at 3-4]. In addition, the habeas court implicitly found that defense counsel's failure to request a limiting instruction did not affect the outcome, as the prosecutor referred only briefly to Satomba's testimony in his closing argument and "made no argument that Satomba's testimony provided substantive evidence of petitioner's guilt." [<u>Id.</u>, at 2].

32. Thus, the state habeas court found that both prongs of the <u>Strickland</u> standard had been met, in that counsel's performance was not deficient and did not result in an unfair trial. This Court agrees. In its opinion on Smith's direct appeal, the state supreme court applied <u>Tome</u>, a recent U.S. Supreme Court decision, for the first time. Trial counsel is not required to anticipate a later ruling by a state appellate court on pain of being labeled constitutionally ineffective. Counsel in this case had reason to assume that the evidence was being admitted for substantive purposes pursuant to Rule 801(D)(1)(b), as that is the ground upon which the prosecution offered the evidence and the ground upon which the court admitted it. Counsel therefore had no reason to request a limiting instruction to the effect that the evidence should be considered for rehabilitation only.

> [I]t is well established that when evidence is admitted for the wrong purpose, there is no error when the defendant does not request a limiting instruction . . . . In this case, it would have been pointless for Defendant to request a limiting instruction, even though he was entitled to one, because the court had already ruled that the evidence

was nonhearsay under Rule 11- 801(D)(1)(c).  The instruction would
have been denied had it been requested.

State v. Lopez, 123 N.M. 599, 604, 943 P.2d 1052, 1057 (Ct. App. 1997).  It does not constitute

ineffective assistance of counsel to fail to make a futile argument.  United States v. Cook, 45 F. 3d

388, 392-93 (10th Cir. 1995).  Indeed, making futile or unsupported arguments could well be

counterproductive.

    33.  The Court finds that the ruling by the state habeas court was neither contrary to nor

involved unreasonable application of clearly established federal law, nor was it based on an

unreasonable determination of the facts in light of the evidence presented, and concludes that federal

habeas relief should be denied with respect to this claim.

### *Claim I B*
### *Ineffective Assistance of Counsel*
### *in Failing to Seek Exclusion of Lucero's Testimony*
### *on Grounds his Immunity Agreement was Impermissibly Coercive*

    34.  Smith's second charge of ineffectiveness is that his attorney failed to make a pretrial

motion to exclude Lucero's testimony in toto, on the ground that his immunity agreement with the

state was impermissibly coercive.

    35.  The transactional immunity agreement between Lucero and the State begins with an 11-

paragraph recitation of the facts as understood by the State.  The agreement then states that "Frank

Lucero will give complete and truthful statements of all facts know to him regarding the murder of

Gerol Younger Jr. as represented by his attorney and set forth in paragraph 1 through 11."  Lucero

further agreed to assist in the continuing investigation, and the State agreed not to prosecute him for

his role in helping dispose of Younger's body and his car.  The agreement went on to state that it

would be "null and void if any credible evidence is subsequently discovered that Frank Lucero

participated in the murder . . . ."  [Answer, Ex. N, Ex. 1 thereto].

36.  On direct examination, Lucero described his understanding of his immunity agreement to be that, "I[f] I come forth, cooperate, tell the truth to the best of my knowledge, basically cooperate and – basically just tell the truth to the best of my knowledge," then no charges would be brought against him.  [TR 3, at 146].  On cross examination, he was asked whether it was his understanding that "transactional immunity" means that "for the whole incident, you have no exposure, as long as you testify truthfully and do whatever they say, right?"  Lucero responded, "Come to the trials and help, yes."  [TR 4, 105-106].

37.  The State sought to have the agreement itself admitted into evidence.  Defendants' counsel objected on grounds that the first 11 paragraphs constituted a recitation of the State's version of the facts, and it would be prejudicial and would unduly emphasize the State's case to allow the agreement into evidence.  The trial court sustained the objection, noting that the agreement contained hearsay and "basically capsuliz[ed] what the state hoped the evidence to be."  [TR 4, at 148-150; TR 8, at 72-73].

38.  On direct appeal, Smith argued that the immunity agreement required Lucero to testify in conformance with the facts as set forth in the agreement – that is, that he had to "tell a particular story" in order to reap the benefit of transactional immunity – and this was so coercive as to deny Smith a fair trial.  While acknowledging that "it is possible to interpret this language as Defendants argue – that is, as compelling Lucero to testify to a particular story, whether truthful or not," the state supreme court rejected that interpretation, finding rather that the record as a whole "supports a conclusion that the prosecutor did not intend to compel Lucero to testify other than truthfully and that Lucero understood he was to testify truthfully," and that if he did so no charges would be

brought against him.  The defense did not elicit anything to the contrary on cross examination.  State v. Smith, *supra*, 126 N.M. at 344-346.

39.  Smith's state habeas petition raised this issue as one of ineffective assistance of counsel for failing to move pretrial to exclude Lucero's testimony.  At the habeas hearing, Smith's trial counsel testified that such a motion was "not something I thought about prior to trial."  He stated that, while he thought Lucero was eager to please the prosecutors, it was also his impression that Lucero was a "willing witness" and that no one twisted his arm to get him to testify.  Counsel stated he has no reason to think that a motion to exclude Lucero's testimony based on coercion would have been successful, and in any event, Smith's defense team had a full opportunity cross examine Lucero at trial.  [HC I, at 13, 36-38, 59-60].

40.  The attorney for Smith's co-defendant Brown testified that she considered filing such a motion but, after she interviewed and deposed Lucero, she determined that the agreement was not in fact coercive and she felt such a motion would be "meritless."  [HC II, at 5-7].  She also stated that neither she nor Smith's attorneys uncovered any other evidence that Lucero was coerced into testifying in a particular fashion.  [HC II, at 19].

41.  One of the trial prosecutors also testified at the habeas hearing.  He denied that Lucero was coerced to testify in any particular way; rather, the only obligation imposed on him was to tell the truth.  [HC II, at 32-36].  He stated further that the reason for including the 11 factual paragraphs in the immunity agreement was to get that information before the jury to counter the effects of what he anticipated would be vigorous cross-examination of Lucero by defense counsel.  He hoped to have the immunity agreement admitted into evidence so that the jury would have these facts before them as they deliberated.  [HC II, at 33, 55].

42. The state habeas judge found that the Lucero's testimony was not inherently unreliable due to the immunity agreement, and that his credibility was properly left to the jury. He further found no reasonable probability to conclude that a motion to exclude the testimony would have been successful. [Answer, Ex. R, at 5].

43. This Court finds nothing on the record that would tend to show Lucero was coerced into testifying as he did. Lucero asserted at trial that he understood his obligation was simply to testify truthfully. The only part of the record which supports Smith's argument on this claim is the language of the immunity agreement, setting forth the facts as the State understands them to be, and the fact that both Smith's counsel and the attorney for the State found this an unusual way to draft an immunity agreement. [HC I, at 58-59; HC II, at 45]. This does not establish that the agreement was coercive.

44. The Court concludes that the New Mexico courts did not act unreasonably either on direct appeal or in the habeas proceeding. The record does not support a finding that a pretrial motion to exclude Lucero's testimony would have been successful. Smith's attorneys were not, therefore, ineffective for failing to bring such a motion, nor can the Court say that the result of the trial would have been different if they had done so.

45. The therefore finds that the rulings by the state courts were neither contrary to nor involved unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts in light of the evidence presented. Federal habeas relief should therefore be denied with respect to this claim.

### *Claim I C*
### *Ineffective Assistance of Counsel*
### *in Failing to Present Evidence Regarding Timing of Spikes' Motive to Lie*

46.  The "premotive rule" of <u>Tome v. United States</u>, discussed above under Claim I(A), arises again in connection with this claim.  Smith faults his counsel for failing to present "readily available evidence," in the form of testimony of certain witnesses who would have recounted Denise Spikes' efforts to establish an alibi for herself shortly after Younger's murder in September 1992.  He contends that this evidence would have established that Spikes' motive to fabricate arose at the  time of the murder – much earlier than the date found by the state court – and therefore would have rendered inadmissible certain prior consistent statements which Spikes made in September 1992.

47.  These prior consistent statements came through the testimony of Spikes' friend Theresa Jimenes.  Jimenes testified at trial, over objection by Smith's counsel, that in September 1992, Spikes told Jimenes about events she witnessed on the day of the murder.  [TR 8, at 36-41].  The version of events recounted by Jimenes, as told to her by Spikes, was consistent with Spikes' testimony at the trial and was harmful to Smith's defense.

48.  The issue of admissibility of Jimenes' testimony was raised in Smith's direct appeal.  The New Mexico Supreme Court upheld the trial court's evidentiary ruling, finding that Spikes' motive to lie arose in 1993, when she was questioned by police regarding the murder.  <u>State v. Smith</u>, *supra*, 126 N.M. at 352.

49.  In his state habeas petition Smith argued, as he does in this proceeding, that Smith's attorney rendered ineffective assistance in not presenting the testimony of Victor Jimenes and Rodney Tolbert, both of whom stated in pretrial interviews or depositions that Spikes asked them to provide her with a false alibi. This, Smith contends, would have established that Spikes' motive to

17

lie arose at the time of the murder.  In addition, Smith argues that statements in Spikes' own pretrial deposition would have tended to establish an earlier date for her motive to lie.

50.   At the evidentiary hearing, Smith's trial attorney was asked why he did not call Mr. Jimenes and Mr. Tolbert to testify at trial.  He responded that, beside the fact that the witnesses had unflattering things to say about Smith, he also felt this evidence would not have been at all helpful to his theory of the defense.  [HC I, at 18-19, 40-41].

51.   The state habeas judge found that trial counsel's decision not to bring the pretrial witness statements before the court was a tactical one, in that the statements by Victor Jimenes and Rodney Tolbert would have been prejudicial to the defense, and he concluded that "[r]easonably competent attorneys would have concluded that there was greater potential for damage in presenting this evidence than in using the existing evidence to establish when Spikes' motive to lie arose."  He found that failure to present these statements did not affect the outcome of the trial.  [Answer, Ex. R, at 6-7].

52.   The decision whether to call a particular witness is a tactical decision and is nearly always seen as a matter of discretion for trial counsel.  United States v. Miller, 643 F.2d 713, 714 (10th Cir. 1981).  Trial tactics and strategy are the province of trial counsel and should not be second-guessed.  It may be error to fail to call a witness in some limited situations, for example "when that witness would present the only defense available."  Id.  But that was not the case here.  The Court agrees with the state habeas court that the failure to present the pretrial statements described above, in support of the defense arguments as to when the motive to lie arose, was a tactical decision not implicating Smith's due process rights and met the "objective standard of reasonableness" of Strickland.  In this case, as in United States v. Snyder, 787 F.2d 1429, 1432 (10th Cir. 1986), "it is

18

at least as reasonable, and maybe more so, to speculate that the testimony of those witnesses would have damaged defendant's case, given the possibility of harmful statements . . . and their vulnerability on cross-examination."

53.   The state habeas court's finding on this claim was neither contrary to nor involved unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Federal habeas relief should be denied with respect to this claim of ineffectiveness.

### *Claim I D*
#### *Ineffective Assistance of Counsel*
#### *in Failing to Object under Rule 403 to Testimony of O'Grady and Jimenes*

54.   In its opinion on Smith's direct appeal, the New Mexico Supreme Court found no error in the trial court's ruling admitting certain testimony by witnesses Theresa Jimenes and Constance O'Grady, who were former friends of Spikes.  Their testimony included a recounting of prior inconsistent statements made to these witnesses by Spikes, which statements were harmful to Smith's defense.  The supreme court stated in *dicta* that although the prior inconsistent statements were not excludable on the grounds argued by Smith's attorneys at trial, they might have been excluded if defense counsel had made an objection under NMRA 11-403.[3]  State v. Smith, *supra*, 126 N.M. at 353.  Citing the state supreme court's *dicta*, Smith's counsel now argues that Smith's attorneys were ineffective in failing to seek exclusion of the testimony under Rule 403.

55.   The version of NMRA 11-801(D)(1)(a) which applied at the time of Smith's trial defined as non-hearsay an out-of-court prior statement made by a declarant who testifies at trial and is subject

_____

[3]NMRA 11-403 parallels Fed. R. Evid. 403 in providing that even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.

to cross-examination, when the prior statement is inconsistent with the declarant's testimony at trial. The rule has since been amended to require that the prior inconsistent statement must have been given under oath subject to the penalty of perjury at trial; however, this requirement was not part of the rule as it applied at Smith's trial. *See*, <u>State v. Baca</u>, 120 N.M. 383, 391-92, 902 P.2d 65, 73-74 (1995).

56.   In her testimony at trial, Denise Spikes stated that when she and Younger were divorced, he removed her as a beneficiary of his life insurance policy and that "everybody in my family and everybody knew that." She denied telling Theresa Jimenes that Younger told her she was still on his insurance policy and that if he died she would get some money. She further denied telling Jimenes that Smith wanted her help in killing Younger so they could collect the insurance money, and she also denied telling Constance O'Grady her purpose in going to Albuquerque was to murder Younger. [TR 6, at 45-46; 52-53, 118-119].

57.   However, Theresa Jimenes later testified, over objection by Smith's attorney, that in August 1992 Spikes told her that she and Smith had conversations in which Smith talked to her about killing Younger for his insurance money. [TR 8, at 19-25]. Smith's attorney cross examined Jimenes about this testimony [TR 8, at 51-51] and moved for a mistrial at the close of the State's evidence, on grounds the Jimenes testimony, and other evidence, was inadmissible hearsay. [TR 8, at 74- 75].

58.   Prior to Constance O'Grady's testimony, Smith's counsel moved to exclude her entirely on hearsay grounds, arguing that her testimony was nothing more than "improper bolstering." The trial court overruled the objections and allowed O'Grady to testify. [TR 7, at 49-53]. She said that in June 1994 Spikes told her that she and Smith, along with some others, were planning to kill Younger. She further recounted what Spikes told her about the murder. [TR. 60-64]. On cross examination, O'Grady testified that Spikes told her Younger "deserved what he got" and that "it was

20

either her . . . or him." [TR 7, at 78].

59.   In his direct appeal, Smith cited admission of Spikes' prior inconsistent statements through Theresa Jimenes and Constance O'Grady.  The state supreme court upheld the trial court's admission of the testimony, stating:

> [B]ecause Spikes gave both favorable and unfavorable testimony, the prosecution was entitled to offer evidence of any prior inconsistent statements, which the trial court might have been asked to exclude under Rule 11-403, NMRA 1998.  In this case, however, neither Defendant made a sufficiently specific objection to alert the trial court to the need to balance the probative value of the testimony in impeaching Spikes against the prejudicial effect of the particular prior inconsistent statements to which O'Grady and Jimenes testified.

State v. Smith, *supra*, 126 N.M. at 353.

60.   Smith cited this language in his state habeas petition, arguing that if counsel had made the Rule 403 objection, "either the trial court would have excluded the evidence – thus significantly weakening the prosecution case – or a meritorious issue would have been preserved for appeal." [Answer, Ex. M, at 13].  The same argument is made in Smith's federal habeas petition.

61.   At the evidentiary hearing, Smith's counsel testified that he felt "[t]here wasn't a legitimate 403 objection to be made," in part because evidence was significant, rather than collateral.  He said further that he felt the grounds raised should have been sufficient to exclude the evidence. [HC I, at 21-22, 46].

62.   The judge in the state habeas proceedings found that any Rule 403 objection would not have succeeded because the evidence was in fact more probative than prejudicial, and he concluded that petitioner failed to demonstrate either that a reasonably competent attorney would have made a Rule 403 objection or that such an objection, had one been made, would have affected the outcome

of the trial. [Answer, Ex. R, at 7-8].

63. This Court finds nothing unreasonable about outcome of the state habeas proceeding. Rule 11-403, like its federal counterpart, requires that the prejudicial effect must "substantially" outweigh the probative value before a 403 objection will be sustained. The weightier the probative value, the greater the prejudice needed to override it. *See*, United States v. Weir, 28 F.3d 114 (Table, text in Westlaw), 1994 WL 245230, at *1 (10th Cir. June 6, 1994) (an objection under Rule 403 is successful, generally, only when the evidence sought to be excluded is of "marginal relevance" or "minimal probative value" so that the prejudicial effect substantially outweighs it). *See also*, Vaughn v. Johnson, 2001 WL 912657, at *19 (N.D. Tex. Aug. 7, 2001):

> the Court cannot find that Vaughn's attorneys' failure to object under Rule 403 fell below an objective standard of reasonableness . . . . In light of the highly relevant nature of the extraneous crimes evidence to the crucial issue in the case . . ., the Court finds that any objections by Vaughn's attorneys under Rule 403 would likely have been futile . . . . In view of the extremely probative nature of the extraneous crimes evidence . . ., the Court finds Vaughn's assumption that the trial court would have sustained the objection and precluded the evidence to be based on pure speculation.

64. The same is true in the present case. The testimony of Jimenes and O'Grady testimony, to the effect that Spikes told them she and Smith discussed killing Younger for insurance money, provided the jury with another possible motive, aside from jealously, for Smith to have wanted to kill Younger. It also tended to show that the crime was planned well in advance and was not the result of a sudden impulse or heat of passion. This testimony was of more than marginal relevance. The court had already rejected defendant's hearsay objections to the testimony, and the Court cannot say that the attorneys were deficient in not coming back to raise a Rule 403 objection. Garrett v. United States, 78 F.3d 1296, 1301-02 (8th Cir. 1996):

The failure of Garrett's attorney to move to exclude Rodriguez's testimony under Federal Rule of Evidence 403 did not fall outside the wide range of competent professional assistance. The trial judge had ruled that the testimony was not barred by the hearsay rule . . . [and] counsel may have reasonably determined that a Rule 403 objection would have been fruitless. The performance of an attorney is not deficient because the attorney failed to object to admissible evidence, . . . and the trial court had already determined that the statements were not hearsay . . . . The lack of a Rule 403 objection, moreover, does not give rise to a reasonable probability that Garrett would have been found not guilty by the jury. Speculation as to what the district court would have done if presented with this motion is not equivalent to a showing of prejudice sufficient to undermine confidence in the outcome of the trial. Nor was the evidence against Garrett flimsy or unpersuasive.

65. In this case, too, the Court cannot say that exclusion of this testimony would have made a difference in the outcome of the trial, given the fact that the Jimenes and O'Grady testimony was not entirely negative for Smith. It tended to undermine Spikes' credibility, since it contradicted Spikes' own in-court testimony, and it this testimony, along with Lucero's, that was the most damaging to Smith. While exclusion of the Jimenes and O'Grady testimony may have been somewhat helpful to Smith by eliminating an additional motive for the killing, the Court cannot say with reasonable probability that exclusion of this testimony would have changed the course of the trial. Theirs was not the only evidence of motive and, in addition, the prosecution had eyewitness testimony which implicated Smith in the murder.

66. The state court's habeas decision on this issue was neither contrary to nor did it involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Federal habeas relief should be denied with respect to this claim of ineffectiveness.

67. The Court also rejects petitioner's argument that cumulative error by counsel rendered

23

the trial unfair.  When faced with a claim of cumulative error, the Court's job is to "asses[s] the aggregate prejudice arising from the several constitutional errors we find here."  Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003).  No errors by counsel having been established, there is no basis for inquiring into the cumulative effect of errors.

### *Claim II A*
### *Brady Violation*

68.  Smith claims that he was denied a fair trial because the court did not order the prosecution to supply the defense with records of police investigations of other contemporaneous killings in Albuquerque with modus operandi similar to that of Younger's killer.  Smith argues that the prosecution's denial of access to this arguably exculpatory evidence violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and the trial court violated his right to due process by failing to hold an evidentiary hearing or to order production of the material.

69.  Prior to jury selection, Smith's attorney informed the court that the State had refused to turn over investigative reports related to the suicide of an arson investigator, as well as reports related to the murders of two prostitutes at least one of whom was found bagged and bound in a condition similar to Younger's body.  Smith's counsel argued that these investigatory materials might be exculpatory in that they could provide the true explanation for the Younger homicide.  [TR 1, at 3-4].  The prosecutor responded that the State did not have possession of these investigative reports and that, in any event, disclosure of this information could jeopardize ongoing investigations.  [TR 1, at 6-8].

70.  Shortly before the close of evidence, Smith's attorney made a proffer of evidence in an attempt to revive this issue.  The proffer concerned the testimony of Officer Karen Thomas.  He

24

stated that Thomas would testify about investigations into other homicides which occurred around the time of Younger's murder and the fact that the Sheriff's Department was investigating these deaths and Younger's as related homicides. Counsel renewed his motion for the reports on these deaths, and asked the court for either a continuance so that the Smith team could develop their defense further through the use of the reports or, in the alternative, that the court declare a mistrial. The motion was denied. [TR 8, at 1-4].

71. On direct appeal, the New Mexico Supreme Court noted that Smith's information about the other homicide cases came from the newspapers, and he "surmised" that the deaths might be linked. "He had no other basis for requesting the police files on these other cases," the court continued, and "this is not enough to establish a due process violation," which requires a showing of a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed. State v. Smith, *supra*, 126 N.M. at 344:

> There may have been a facial resemblance between the way the body of Younger and that of the other victim had been found, but that resemblance is not enough to show that it was probable that the result of the trial would have been different had the evidence been disclosed.

72. The issue was raised again in the state habeas proceedings. At the evidentiary hearing, Smith's counsel testified that he had sought disclosure of the reports on the other murders because the bodies were found in very similar situations and, as it was clear that Smith had nothing to do with those other murders, the evidence was therefore exculpatory. [HC I, at 27-28]. On cross examination, he acknowledged that although the body of one of the other two homicide victims was bagged and bound in a manner similar to Younger's, she had been shot in the head, not pummeled with a hammer as Younger had been. The other death under investigation was a suicide victim whose

body was found in his car.  He was not bagged and his body was not found in the ditch, although his

car was parked nearby.  Smith's counsel stated at the hearing that he felt there was a connection

between these deaths and Younger's, based on some statements made by one of the investigating

detectives to the effect that the Sheriff's department was conducting multiple investigations at the

same time, and based on a witness' statement that she was acquainted with Smith, Younger, Lucero,

and also with the suicide victim.  [HC I, at 53-57].

73.  The state habeas judge held that Smith had presented no additional information, aside

from that raised on direct appeal, to justify disclosure of the investigative reports.  The court

concluded that there was insufficient evidence to show that the other homicides were related to

Smith's case and denied the petition on this issue.

74.  This Court cannot say that the state courts' rulings were unreasonable.  Brady v.

Maryland, *supra*, requires disclosure of material evidence which is exculpatory to the defendant, and

the defense has the burden of showing the elements necessary for disclosure.

> The Constitution, as interpreted in Brady, does not require the
> prosecution to divulge every possible shred of evidence that could
> conceivably benefit the defendant.  *See, e.g.*, Moore v. Illinois, 408
> U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) ("We
> know of no constitutional requirement that the prosecution make a
> complete and detailed accounting to the defense of  all police
> investigatory work on a case.");  United States v. Comosona, 848
> F.2d 1110, 1115 (10th Cir.1988) ("The Government has no obligation
> to disclose possible theories of the defense to a defendant.").   Due
> process only requires the disclosure of material exculpatory evidence
> which, if suppressed, would deprive the defendant of a fair trial . . . .
> Therefore, in order to establish a Brady violation, the defendant bears
> the burden of establishing:  1) that the prosecution suppressed
> evidence;  2) that the evidence was favorable to the accused;  and 3)
> that the evidence was material. [Some internal punctuation omitted].

Smith v. Secretary of New Mexico Dep't of Corrections, 50 F.3d 801, 823-24 (10th Cir. 1995).

75. In this case, both the state supreme court and the state district court on habeas review found that defendant failed to meet this burden. This Court agrees. Smith's argument that the material sought was exculpatory is grounded on: (1) a statement by a sheriff's department investigator that several homicides were being investigated around the same time; (2) the fact that a witness was acquainted with three of the principals involved in this case as well as one of the other victims; and (3) newspaper reports on the other death which indicated that one victim's body was found wrapped in a manner similar to that of Younger's, although the cause of death in that case was a gunshot wound rather than hammer blows.

76. Smith argues that this evidence tends to show that someone else, presumably the person who killed these other victims, was also Younger's murderer. The Court finds this argument unpersuasive, as did the state courts, and the evidence simply insufficient to meet defendant's burden. Viewing the significance of the undisclosed evidence in relation to the record as a whole, the Court cannot say that information about these other homicides was material to Smith's case nor that the evidence was directly exculpatory. *Compare*, *e.g.*, Banks v. Reynolds, 54 F.3d 1508, 1518 (10th Cir. 1995), wherein two eyewitnesses positively identified someone other than the defendant as the perpetrator of the crime.

77. Smith also faults the trial court for failing to hold an evidentiary hearing on the issue of whether the materials sought were in fact exculpatory. No motion for such a hearing was made, however. The Court finds that the state courts' decisions on the Brady issue were neither contrary to nor involved an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts in light of the evidence presented. Federal habeas relief should be denied with respect to this claim.

27

***Claim II B***
*Imposition of the Karen Thomas Stipulation*
*as Violating the Right of Confrontation*

78.  Smith claims that the trial court's imposition of stipulated testimony by Sheriff's Deputy Karen Thomas violated his constitutional right of confrontation.  Officer Thomas was ill at the time of trial and could not testify in person, and the defense and prosecution therefore attempted to agree on stipulated testimony for admission at trial.

79.  The stipulation which was ultimately read to the jury contained ten paragraphs.  Smith's attorneys stipulated to only the first eight of these and objected to introduction of paragraphs Nine and Ten.  Smith argues that introduction of the two contested paragraphs deprived him of the right to cross examine the officer as to these two statements.  Both the state supreme court and the state habeas court rejected this argument.

80.  Prior to trial, the prosecution filed a motion in limine seeking to exclude any evidence that the victim, Younger, was allegedly involved in drug trafficking.  One piece of evidence the State specifically sought to exclude was testimony by Officer Thomas that she had begun a case file documenting some alleged drug activity by Younger.  No case was ever pursued against him. [Record Proper (hereinafter, "RP"), at 184-186].

81.  At a pretrial motions hearing, the State argued that Thomas really had nothing concrete to offer that would prove Younger was involved in drugs, and the evidence would be more prejudicial than probative.  [Transcript of Pretrial Motions Hearing, September 11, 1995, at 24-25; hereinafter referred to in the format "PMH, at 24-25"].  Smith's attorney argued that the evidence supported the defense theory that the murder arose from a bad relationship between Lucero and Younger arising from a drug deal gone wrong, and that as such it went to the heart of the case and was not, as the

28

prosecution would have it, "character in nature." [PMH, at 26]. The court indicated that to the extent Thomas could testify that she observed drug activity, and not merely provide hearsay, the evidence would be admissible. [PMH, at 27].

82. On day seven of the trial, the State's attorney notified the court that Officer Thomas, who was listed as a defense witness, was seriously ill with a condition that caused grand mal seizures which affected her memory. Counsel stated further that Thomas would testify that she had been investigating Younger shortly before his death on suspicion of drug dealing. She would say that she observed Younger in his identifiable white BMW in an area of South Broadway known for drug activity and that younger men came up to his car and talked to him on numerous occasions. [TR 7, at 94-96].

83. Toward the end of the State's case, the prosecution moved to exclude any testimony by Thomas, arguing the evidence was not relevant to defendants' attempts to link Younger with Frank Lucero to support the defense position that Younger was killed not by defendants but by Lucero over a drug deal gone bad. At this point in the trial, the court stated that the testimony would not be allowed until an offer of proof had been made. [TR 7, at 94-96].

84. On day nine of the trial, Smith's attorney informed the court that the parties had agreed to enter into a stipulation as to what Officer Thomas' testimony would be if could have testified in person. He made an offer of proof, stating that Thomas would testify that while she was working as a narcotics detective in 1992, she observed a car matching the description of Younger's several times in an area of the South Broadway neighborhood. She saw a man in the car fitting Younger's description, observed young men approaching the vehicle, saw hands come in contact with the man, and based her professional experience, she thought the behavior was consistent with drug trafficking.

[TR 9, at 1-4].

85.  The State's position was that the Thomas testimony about her investigation into drug activity in the South Broadway area was irrelevant to this case, and fell under prior bad acts by the victim.  The court ruled that the stipulation could be read to the jury, over objection by Smith's counsel that defendants specifically did not agree to the last two paragraphs of the ten-paragraph stipulation.  The first eight paragraphs dealt with Thomas's observations regarding the South Broadway activity.  The testimony as set forth in the final two paragraphs was to the effect that Thomas was unaware of any drug connection between Frank Lucero and Younger, and that she was unaware of a person named Frank Lucero the summer of 1992 when she observed this activity.  The court ultimately ruled that the stipulation would be read to the jury but would not be allowed into the jury room, over objection by Smith's counsel that the jury should be allowed to take it with them into deliberation.  [TR 9, at 4-10; TR 10, at 1].  The full ten-paragraph stipulation was read to the jury. [TR 9, at 15-16].

86.  On direct appeal, Smith argued that admission of the Thomas stipulation was error and violated his right to confrontation and cross examination.  The Supreme Court found no error, noting that Thomas was a defense witness who would not be subject to cross examination by Defendants in any event, and it was Defendants who sought to have her testimony admitted and who agreed to the full stipulation in preference to forgoing her testimony altogether.  The first eight paragraphs of the stipulation fit the defense theory of the case, the court said, and "We agree with State's contention that Defendants accepted paragraphs nine and ten of the stipulation in order to gain the first eight paragraphs of the stipulation."  State v. Smith, *supra*, 126 N.M. at 347-348.     87.  At the evidentiary hearing on the habeas petition, Smith's attorney acknowledged that the State had

unsuccessfully attempted to keep the Thomas evidence out altogether. He stated that the parties had

a phone conversation with Thomas during trial, in the judge's chambers and off the record, and that

the stipulation as read to the jury accurately set forth what Thomas said in the phone conversation

and that it represented the testimony she would have given if she had been able to appear in court.

He acknowledged that the first eight paragraphs "really helped" the defense case in that they implied

Younger's involvement in the drug trade. He said it was a tactical decision to allow admission of the

entire stipulation, in order to get in the first eight paragraphs. However, he felt it was unfair and

inaccurate for the trial judge to say to the jury that the defense stipulated to the entire testimony,

when it had not in fact stipulated to the last two paragraphs. [HC I, at 49-53; 62].

88. At the habeas hearing, one of the State's attorneys testified that the trial judge did not

force Smith's counsel to accept the stipulation as it was eventually entered. He stated further that

the State was not happy about the stipulation, either, as several points the State would like to have

included were not allowed by the trial judge. In fact, he testified, he'd had "a bad feeling" about the

stipulation because, "[w]e got two points in, they got eight points in," and he felt it was probably

more damaging to the State than helpful. [HC II, at 39-41].

89. In its opinion rejecting this claim, the state habeas court noted that Smith agreed to the

Thomas stipulation despite reservations about points 9 and 10, because the other eight paragraphs

were important evidence presenting a  link between Younger and illicit drug activity, and that it was

clear that the final two paragraphs accurately represented what Thomas told the parties in the phone

conversation. The habeas judge concluded that it was a tactical decision on the part of Smith's

counsel to agree to the full ten-point stipulation and that Smith could not expect that he would be able

to present the testimony without having the State bring out in the stipulation evidence that it would

have elicited on cross examination.  [Answer, Ex. R, at 8-9].

90.  This Court cannot say that the two state court decisions were unreasonable.  Smith argues that admission of the two final paragraphs "prejudiced Smith by undermining a significant part of his theory of defense" [Doc. 13, at 23], but this Court does not find that to be the case.  Smith's attorney did in fact agree to allow the stipulation into evidence because it contained information helpful to Smith's case which otherwise would not have been available.  He relied on the helpful portion of Thomas' stipulated testimony in his closing argument.  [TR 9, at 46].  It is clear that the defense accepted the two arguably detrimental paragraphs in exchange for the eight helpful ones, and that this was done as a matter of trial tactics.  From a tactical and strategic standpoint, the agreement concerning the stipulation was far more helpful to the defense than to the State.  Smith's Counsel stated at the habeas hearing that the defense team considered the risks and benefits and concluded it was more beneficial than harmful to have Thomas' testimony put before the jury, even if the stipulation was not all that the defense would have wanted.

91.  It is true that counsel did not have the opportunity to cross examine Thomas as to the final two paragraphs.  However, under the circumstances this does not constitute violation of his right to confront witnesses against him, as the witness was presented as part of the defendant's case and would not have been subject to defense cross examination.  Even if this scenario had raised issues with regard to the confrontation clause, Smith waived this constitutional right by entering into the stipulation pursuant to a reasonable trial strategy.  Hawkins v. Hannigan, 185 F.3d 1146, 1154-55 (10th Cir. 1999).  Nor can the Court say that exclusion of the two paragraphs, wherein Thomas said she had no knowledge of Lucero and was not aware of any drug-related link between Lucero and Younger, would have changed the outcome.  Smith's agreement to the stipulation did not preclude

his arguing that this testimony did not mean that no such link existed, and it allowed him to argue in closing that Younger was under surveillance as a drug trafficker, thus bolstering the defense theory of a drug deal gone wrong.

92.  The Court sees no constitutional violation in the manner in which the Thomas stipulation was handled at trial.

### *Claim II C*
### *Lucero Immunity Agreement as Violating Due Process Because Impermissibly Coercive*

93.  This claim is rejected for the reasons stated above under Claim I(B), wherein Court found reasonable the state courts' rulings rejecting Smith's claim that his counsel was ineffective for failing to move for suppression of the Lucero immunity agreement.  The record demonstrates the agreement was not impermissibly coercive.

### *Claim II D*
### *Restrictions on Lucero Cross-Examination and Other Methods*
### *of Discrediting Him as Violating Smith's Confrontation and Due Process Rights*

94.  Smith next claims that his rights under the confrontation clause were violated when the trial court precluded him from cross examining Lucero about prior instances in which Lucero refused to take responsibility for his own behavior and attempted to exculpate himself when accused of criminal behavior.  In addition, Smith includes under this heading three other claimed instances of constitutional violations involving the trial court's preclusion of evidence relating to Lucero's alleged prior drug-related activities.  All of these claims go to Smith's allegation that he was unduly restricted in his efforts to discredit Lucero, the only direct eyewitness to the murder who testified at trial.  The issue involving prior arrests evidence was raised on direct appeal; the three other issues were raised only on state habeas review.

95.   The primary argument under Claim II(D), and the one raised on direct appeal, is that Smith was deprived of the right to cross examine Lucero as to previous attempts to exculpate himself. Prior to trial, the State moved in limine to prohibit the introduction of Lucero's juvenile and adult arrest records.  The motion stated that Lucero had been arrested three times.  The first when Lucero, a freshman in high school at the time, was arrested for spraying a fire extinguisher into a creek bed. The second was a juvenile arrest in California for involvement in an incident of breaking into or damaging cars.  Lucero claims he had nothing to do with the incident but was drunk and passed out at the time the vandalism occurred, and that his friends woke him up shortly before they were all arrested.  The third incident was an adult arrest for receiving stolen property in 1989, six years prior to trial.  Lucero says that this arrest came about because he was with another person who stole a jacket from a ski shop; he denied having prior knowledge of the theft or helping with it in any way. No charges were brought against Lucero in connection with this incident.  [RP, at 178-80].

96.   At the pretrial motions hearing, counsel for the State argued that the prior instances were merely arrests, not convictions, and that the defense wanted to introduce this evidence to show Lucero acted in this case in conformity with his prior behavior, a use prohibited by Evidence Rule 404(B).  Smith's counsel countered that in each instance Lucero attempted to exculpate himself by claiming innocence and casting blame on others, that he was doing the same thing in this case, and that the defense wanted to be able to point out to the jury this pattern of Lucero's behavior as probative of his veracity.  [PM, at 1-3].  The motion to exclude this evidence was granted, on grounds its probative value was outweighed by the prejudicial effect.  [PM, at 4].

97.   During cross examination of Lucero at trial, Smith's counsel asked to clarify the record with regard to the court's ruling forbidding evidence of Lucero's prior arrest record.  Counsel pointed

34

out that this evidence tended to show Lucero's habitual response to allegations of wrongdoing against him, that is, is to cast blame onto others and paint himself as an innocent bystander.  Counsel noted that on each of the three earlier occasions Lucero's stance was "consistent with his incredible position here in court that he was merely an innocent bystander to what he describes as a horrible crime." [TR 4, at 119-120].  The court reiterated its ruling excluding the evidence on Rule 403 grounds, further stating that the evidence was not permitted under Rule 404(B) or Rule 405.  [TR 4, at 120].

98.   On direct appeal, the state supreme court held that the trial court did not abuse its discretion in limiting cross examination as to Lucero's prior arrests.  The court pointed out that Smith had ample opportunity to cross examine Lucero and did so vigorously on a variety of other issues, and therefore "Smith's argument that he was unable to test Lucero's credibility has no merit." State v. Smith, *supra*, 126 N.M. at 347.

99.   Smith raised the issue again in his state habeas petition.  [Answer, Ex. M, at ¶ II(5)].  The state habeas court did not specifically rule on this claim, although in the order denying habeas relief the court noted that it had considered all the evidence and denied all claims for relief.  [Answer, Ex. R, at 1].  This is sufficient to trigger the deference standard of 28 U.S.C § 2254(d), as the state court clearly rendered an adjudication on the merits of Smith's habeas petition.  Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999) (state court's summary, one-sentence habeas ruling was "on the merits" and therefore the federal habeas court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated"); Gipson v. Jordan, *supra*, at 1196-97:

> a state court reaches a decision "on the merits" even when it fails
> either to mention the federal basis  for the claim or cite any state or
> federal law in support of its conclusion . . . [and] we uphold the state
> court's summary decision unless our independent  review of the
> record  and  pertinent  federal  law  persuades  us  that  its  result

35

> contravenes or unreasonably applies clearly established federal law, or
> is based on an unreasonable determination of the facts in light of the
> evidence presented.

Smith does not argue otherwise in his federal petition, and the Court will apply the deferential

standard articulated in <u>Williams v. Taylor</u>, *supra*, to the state court's denial of his habeas petition.

100.  The Court finds that there was nothing unreasonable in the state court's rejection of this

claim.  The record is clear that Smith's reason for seeking to introduce evidence of Lucero's prior

arrest records was the very reason specifically prohibited in Rule 404(B), that is, to show prior

instances of Lucero's conduct – that is, his tendency to claim innocent bystander status and to cast

the blame on others when accused of wrongdoing – to establish his character and show that he acted

in conformity therewith in this case.  In addition to Evidence Rule 404(B), Smith also relied on Rule

405(B) which allows evidence of specific instances of conduct in situations where a character trait

of a person "is an essential element of a charge, claim or defense."   Although the evidence could

arguably have come in under this standard, the trial court specifically found that the probative value

of the prior arrest evidence was outweighed by its prejudicial effect.  The habeas court implicitly

upheld this ruling as constitutionally reasonable, and this Court defers to that decision.

101.  Although there might have been some minimal value to the defense in cross examining

Lucero about his tendency to push the blame onto others, the stronger force of this evidence would

have come from the fact that he was arrested three times in the past.  These arrests – for possible

involvement in vandalism and shoplifting, two of which occurred when he was juvenile – had nothing

to do with the situation for which Smith and his co-defendant were on trial, and the ruling that

prejudice outweighed probative value was well within the trial court's discretion.  It did not

unconstitutionally restrict Smith's right to cross examine Lucero.  In addition, juvenile adjudications

are "generally not admissible" for impeachment purposes, NMRA 11-609(D), and could have been excluded on this basis as well.

102. The "primary interest" secured by the constitution's confrontation clause is the right of the accused to cross examine witnesses against him. Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110 (1974).

> Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. The Confrontation Clause guarantees Mr. McCarty only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Internal punctuation omitted].

United States v. McCarty, 82 F.3d 943, 950 (10th Cir. 1996). The demands of the Confrontation Clause are satisfied where a defendant has the opportunity to reveal weaknesses in the witness' testimony. United States v. McHorse, 179 F.3d 889, 900 (10th Cir. 1999). The Court cannot say that exclusion of the prior arrest evidence urged by the defense in this case unfairly restricted Smith's ability to reveal weaknesses in Lucero's testimony.

103. As the state supreme court pointed out:

> Smith cross-examined Lucero on each aspect of his testimony. He questioned Lucero regarding his immunity agreement, his decision to tell his story to police, his choice of attorneys, his relationship with Younger and Defendants, and his decision to leave the state. Defendant Smith's argument that he was unable to test Lucero's credibility has no merit. We do not agree that the additional information regarding his previous arrests, none of which resulted in a conviction, would have substantially altered the cross-examination or the result of the trial.

State v. Smith, *supra*, 126 N.M. at 347. This Court agrees. The cross examination of Lucero was

vigorous and wide-ranging, and the Court cannot say that exclusion of the prior arrest evidence resulted in constitutional error.

104.   Smith also raises three other asserted trial errors which he claims unfairly restricted his ability to cross examine Lucero and violated various of his constitutional rights, including: (1) refusal to permit Smith to cross examine Lucero regarding his past drug-related activities; (2) refusal to permit evidence of Lucero's use of intoxicants, including crack cocaine, during the time of the events about which he testified; and (3) refusal to give a limiting instruction about the testimony of an addict. As noted above, these issues were not raised on direct appeal. They were raised in Smith's state habeas petition and were implicitly rejected, although not mentioned specifically in the state court's order denying the petition. The Court applies the <u>Williams v. Taylor</u> deference standard to this denial.

105.   Prior to trial, the State filed a motion in limine to prohibit introduction of evidence of Lucero's drug use. [RP, at 191-192]. At a pretrial motions hearing, the State offered the following facts in support of the motion: Lucero admitted to using cocaine, crack, LSD and marijuana in the past, but he was not convicted of any crimes involving these drugs. In addition, although the State conceded there was evidence that Lucero smoked crack cocaine on two occasions – once two and a half weeks prior to the homicide, the other approximately two or three weeks afterward – there was no evidence that Lucero was using illegal drugs on the day of the homicide. [PM at 6-9].

106.   Smith's counsel argued at the pretrial motion hearing that the evidence that Lucero was smoking crack both before and after the day of the homicide indicated that he was an addict and was under the influence of drugs on the day Younger was killed. He contended that Lucero's use of drugs was relevant to his ability to perceive accurately and supported the defense theory of a drug deal gone

bad.  The court excluded the evidence, excepting any use to show impairment in Lucero's ability to perceive.  [PM, at 9-17].

107.  On direct examination Lucero testified that, after the day he witnessed Smith murder Younger, his state of mind was "not very good at all."  He said he couldn't sleep, had nightmares and was "getting drunk every day" in period shortly after the incident.  He stated further that one reason he didn't go to the police about the incident was because he was "pretty much not capable of thinking" as he drank every day, to the point of passing out.  [TR 3, at 134-145].

108.  On cross examination, defense counsel was allowed to ask Lucero whether he was smoking crack during the period after the homicide. He stated that he had tried it "a couple of times" prior to the incident, and didn't recall whether he'd used it after the incident.  He denied ever selling or trafficking in crack cocaine.  [TR 4, at 23, 93].  Defense counsel attempted to question Lucero as to whether he'd ever "transferred" cocaine from one person to another.  The Court the court sustained the State's objection to this question.  [TR 4, at 94-96].

109.  At trial, Norma testified that she was dating Frank Lucero in the fall of 1992 and that he lived with her for a short time after the Younger murder.  Smith's counsel attempted to elicit from her on cross examination the fact that she and Lucero got high on crack cocaine on October 1, 1992. The court sustained the State's objection holding that Lucero's drug use, two weeks after the date of the homicide, was irrelevant.  [TR 5, at 165-166].

110.  Lucero's cousin Denise Purcell, and Matilda Gonzales, were called by the defense.  They both testified that Lucero came to Purcell's house shortly after the murder, saying he needed a place to stay because he was running from the cops.  Both women testified that Lucero told them  he murdered Younger because he owed Younger money for drugs.  [TR 8, at 109-112; 143-145].

111.   Smith's attorney asked the court to give an instruction on how to judge credibility of a witness shown to be a user of addictive drugs.  [TR 9, at 12].  The court rejected this request, finding that the general uniform jury instruction on credibility was sufficient to cover all matters raised by the parties.  [TR 9, at 13].

112.   Smith's attorney used the evidence of Lucero's drug activity in closing argument, challenging Lucero's credibility on many grounds including his admitted abuse of alcohol and crack cocaine, and he suggested to the jury that Lucero was the actual murderer who killed Younger over a drug debt gone bad.  [TR 9, at 41, 48].

113.   Smith's complaints about the trial court's evidentiary rulings excluding some details of Lucero's past drug use and possible trafficking activity, are not sufficient to justify habeas relief.  "[I]t is not the province of a federal habeas court to reexamine the state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991).

> [On federal habeas review,] [t]he New Mexico state courts'
> evidentiary and procedural rulings may not be questioned unless
> [petitioner] demonstrates that the . . . [ruling] was so prejudicial in the
> context of the proceedings as a whole that he was deprived of the
> fundamental fairness essential to the concept of due process.

Nichols v. Sullivan, 867 F.2d 1250, 1253 (10th Cir. 1989).

114.   Smith has not met this burden.  The trial court ruled that evidence that Lucero was abusing drugs on the day of the killing would be admitted to show impairment in his ability to perceive the events on which he gave eyewitness testimony.  However, no evidence was produced to show such impairment.  The jury was allowed to hear that Lucero was a substantial alcohol

abuser, at least in the period following the homicide, and that he used crack cocaine on two occasions, once before the murder and once afterward.  There was no proffer of any evidence, aside from the implication arising from Lucero's admitted use of crack cocaine on two occasions, that he was addicted to the drug or was impaired by crack or other substances on the day of the killing.

115.  Smith argues that he was unfairly, unconstitutionally restricted in his ability to show that Lucero was involved in drug trafficking, a fact which would support the theory that Lucero, not Smith, killed Younger.  The Court does not agree.  Defendants were allowed to present evidence that Lucero told two people he killed Younger because he owed him money on a drug deal, that Lucero abused alcohol and used crack cocaine on two occasions, that he was seen with a person who may have matched the description of Younger, and that Younger may have been involved in drug trafficking.  In addition, the defense had the opportunity, and used it vigorously, to attack Lucero's credibility on a variety of grounds.  The defense also commented on Lucero's  substance abuse in closing argument.  In the context of the trial as a whole, the trial judge's rulings with regard to evidence of Lucero's drug activity did not render the trial unfair or violate due process.

116.  Smith also complains that the trial court refused to give a cautionary instruction regarding testimony of an addict.  He has, however, failed to make the requisite showing that the court's action rendered the trial fundamentally unfair.

> In a habeas proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden.  A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial . . . .  The question in this proceeding is not whether the instruction is undesirable, erroneous, or even universally condemned, but whether the instruction so infected the trial that the resulting conviction violates due process.  An omission, or an incomplete

> instruction, is less likely to be prejudicial than a misstatement of the law.  [Internal punctuation and citations omitted].

Maes v. Thomas, 46 F.3d 979, 984 (10th Cir. 1995).

117.  It is true that determination of Lucero's credibility was inevitably a crucial factor in the jury's deliberation, as he was one of only two witnesses who testified at trial of their firsthand knowledge of the events surrounding the Younger death, and there was no blood, fingerprint, or other physical evidence linking Smith to the killing.  However, the Court cannot say that failure to give a non-standard instruction, which essentially added a gloss to the credibility instruction given, "so infected the trial that the resulting conviction violates due process."  Lucero's version of events on the day of the homicide was supported by the testimony of other witnesses, including most notably Denise Spikes and Norma Ruiz.  The defense team vigorously attacked the credibility of Frank Lucero, through cross examination and evidence of his behavior and statements with regard to the killing.  There was some evidence that he abused alcohol and drugs, if not as much as the defense would have wanted, and they were able to use this at trial and argue it to the jury in closing.

118.  In sum, Smith has not shown that the evidentiary rulings surrounding the Lucero testimony, and the refusal to give a cautionary instruction on the testimony of an addict, rendered the trial fundamentally unfair and amounted to a denial of due process.  Habeas relief is not available on these claims.

### Claim II E
#### Supreme Court's Use of a Different Theory of Admissibility
#### to Uphold an Evidentiary Ruling as Violation of Due Process

119.  Smith argues that the state supreme court violated his right to due process in upholding, under a different theory than that advanced at trial, the admission of certain evidence.  He contends

that the testimony of Linda Satomba as to statements made by Lucero describing Smith's involvement in the Younger murder was inadmissible, either as substantive evidence under the "prior consistent statement" hearsay exclusion of Rule 801(D)(1)(b), or as rehabilitation after Lucero had been attacked on cross examination.  As discussed above under Claim I(A), the supreme court held that the statements should not have been admitted under Rule 801, but that they were admissible as rehabilitation evidence.  State v. Smith, *supra*, 126 N.M. at 348-352.

120.  Smith argues that this holding by the supreme court violated his right to due process, because the statements were offered by the prosecution at trial for their truth, the trial court admitted them on that basis, and the prosecution argued in closing that the statements were substantive evidence of Smith's guilt.  Smith says it was fundamentally unfair for the supreme court to uphold admission of the evidence on a theory that the State did not assert at trial since, if the evidence were meant only for rehabilitation, Smith would have been entitled to an instruction that the jury could consider the statements for that purpose only.

121.  Smith presented this argument to the state supreme court in a motion for rehearing, filed after the supreme court's decision.  [Answer, Exs. G, H].  The State filed a response, and both parties had an opportunity to brief the issue fully.  The New Mexico Supreme Court denied the motion for rehearing without comment.  [Answer, Ex. J].  Smith raised the issue again in his state habeas petition.  The district judge rejected this ground for habeas relief, holding that the State "properly argued Lucero's prior consistent statements to rehabilitate him" and the supreme court's ruling was not constitutionally unfair.  [Answer, Ex. R, at 3-4].

122.  This Court cannot say that the state courts acted unreasonably, on the motion for rehearing and on the petition for habeas corpus, in rejecting Smith's argument that the supreme

court's decision was "fundamentally unfair."  There was sufficient legal basis for the supreme court to rule that the testimony was proper as rehabilitation evidence, after Lucero's credibility was attacked on cross examination.  The court based its ruling on the fact that, at common law, prior consistent statements were admissible for rehabilitation on several theories, and there is no indication that the U.S. Supreme Court's decision in Tome v. United States, *supra* (discussed above under Claim I(A)) was meant to eliminate these bases.

123.   The state supreme court noted that the defense attacked Lucero's credibility by suggesting on cross examination that his in-court testimony was inconsistent in certain particulars with his statements to his aunt, thus triggering the State's right, at common law, to introduce the complete statement Lucero made to Satomba, in order to rebut these suggestions.  In addition, on cross examination Lucero denied telling his cousin that he killed Younger.  When the defense brought on the cousin to testify to these statements, the court said, the State then had the right to introduce Lucero's prior consistent statement to his aunt, in order to bolster Lucero's denial of making the prior inconsistent statement to his cousin.  Given its reasoning and the authority cited in support, this Court cannot say that the state supreme court was unreasonable in holding the Satomba testimony admissible to rehabilitate Lucero.

124.   Although the evidence was admitted at trial as non-hearsay under Rule 801, the prosecution did not unduly emphasize Satomba's testimony in closing argument.  Indeed, that testimony was mentioned only briefly, the prosecutor noting primarily that Lucero's statements to Satomba were consistent with his testimony on the stand.  [TR 9, 22-23].  The Court cannot say that the State argued to the jury that Satomba's testimony constituted substantive evidence of Smith's guilt.  The state habeas court explicitly found that the State did not do so.  It is true there was no

44

limiting instruction, but as noted above in the discussion of Claim I(A), the Court cannot say that the

lack of a limiting instruction under these circumstances changed the outcome of the trial or rendered

it fundamentally unfair.  Habeas relief is not warranted on this claim.

### *Claim II F*
#### *Failure to Give Lesser Included Offense Instruction*

125.  Smith argues that the trial court's refusal to give an instruction on the lesser included

offense of voluntary manslaughter violated his due process rights.  This issue was raised on direct

appeal.  The state supreme court held there was no view of the evidence under which voluntary

manslaughter could be the highest degree of crime committed, in that no evidence was adduced to

show the defendants killed Younger after being sufficiently provoked.  *See*, N.M.S.A. 1978 § 30-2-3

(voluntary manslaughter statute); N.M.U.J.I. 14-222 (defining  sufficient provocation).    126.  A

state court's ruling on a lesser included offense instruction subject to federal habeas review only in

rare cases.

> The Supreme Court has never recognized a federal constitutional right
> to a lesser included offense instruction in non-capital cases, *see* Beck
> v. Alabama, 447 U.S. 625, 638 n.14, 100 S. Ct. 2382 (1980), and
> neither has this court.  Our precedents establish a rule of "automatic
> non-reviewability" for claims based on a state court's failure, in a non-
> capital case, to give a lesser included offense instruction.

Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004).  In explaining the reason for this rule, the

Seventh Circuit commented:

> To transform the federal courts in the exercise of their habeas corpus
> jurisdiction from enforcers of specific constitutional rights to
> guarantors of the accuracy of state court determinations of guilt
> would enmesh the federal judiciary in almost every detail of state
> criminal procedure and every trial ruling, and we would regularly have
> to review failures to instruct on lesser included offenses under state
> law as well as decide other issues unrelated to a specific federal

> constitutional safeguard.  We shall decline this task until directed to
> take it up by our judicial superiors.

Nichols v. Gagnon, 710 F.2d 1267, 1272 (7th Cir. 1983).

127.  It is only the rare occasion, when the trial court's refusal to instruct on lesser included offense amounts to "fundamental unfairness," which would warrant federal habeas relief.  Chavez v. Kerby, 848 F.2d 1101, 1103 n.1 (10th Cir. 1988); Nichols v. Gagnon, *supra*, at 1269, 1272 (habeas review of failure to instruct on lesser included offense will only be undertaken to correct a "fundamental miscarriage of justice," as when denial of the instruction was likely to have resulted in conviction of an innocent person).

128.  This is not a case implicating such "fundamental unfairness" or "fundamental miscarriage of justice."  There was sufficient evidence adduced at trial to support the jury's finding that Smith murdered Younger, and that he planned well in advance and enlisted the aid of others to do.  The only evidence of provocation – Younger's anger at the fact that Smith physically abused Denise Spikes – was minimal and was countered by other evidence to the effect that Younger walked calmly into room where he was murdered and that he was not carrying any weapons.  There was no evidence that he was excited, agitated, or behaved in a threatening manner as he approached the room.  In addition, the trial record reveals that Smith's primary defense theory was that Younger's killer was actually Lucero, who murdered him over a drug debt, and that Smith and his co-defendant had no part in it. Under all of these circumstances, the Court concludes that the refusal to give a lesser-included instruction did not amount to a miscarriage of justice.  Habeas relief is not warranted on this claim.

### *Claim II G*
### *Cumulative Error*

129.  The Court rejects petitioner's argument that cumulative error by the trial court rendered

the trial unfair.  A cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.  <u>Brecheen v. Reynolds</u>, 41 F.3d 1343, 1370 n.23 (10th Cir. 1994).   No errors having been established, there is no basis for inquiring into the cumulative effect.

### **Recommended Disposition**

That Respondent's Motion to Dismiss [Doc. 10] be granted and the Petition for Writ of Habeas Corpus be denied, and the case be dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge